IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, | |
| Plaintiff, | Case No. 4:08-CV-516-BLW |
| v. | **MEMORANDUM DECISION AND ORDER** |
| KEN SALAZAR, Secretary, DEPARTMENT OF THE INTERIOR, | |
| Defendants. | |

## INTRODUCTION

The Court has before various motions including cross-motions for partial summary judgment. The Court held oral argument on the motions and took them under advisement. For the reasons expressed below, the Court will grant the motion for partial summary judgment filed by plaintiffs and deny the motions filed by defendants and intervenors.

## LITIGATION BACKGROUND

Plaintiff WWP challenges 16 separate BLM Resource Management Plans (RMPs), and their associated Environmental Impact Statements (EISs). These RMPs and EISs were prepared by separate BLM offices in six different states: (1) Idaho; (2) Montana; (3) Utah; (4) California; (5) Wyoming; and (6) Nevada. The lands associated with the 16 RMPs at issue comprise the range of the sage grouse, and WWP alleges that each of the challenged RMPs and EISs failed to adequately consider the environmental impacts of

grazing and energy development, among other influences, on the sage grouse.

WWP's claims are brought pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, for alleged violations of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370h, and the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1700-1787. To streamline the case, WWP and the BLM proposed, and the Court subsequently approved, a case management plan under which the parties would brief initial summary judgment motions concerning two "test case" RMPs – the Craters of the Moon RMP and the Pinedale RMP. The parties have now filed cross-motions for partial summary judgment on these two "test cases," and it is those motions that are under review in this decision.

While the Court has allowed this case to go forward as a collective action, *see Memorandum Decision (Dkt. 31)*, the BLM remains entitled to an individual review of each RMP under the administrative record compiled for that specific RMP. *See* 5 U.S.C. § 706; *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (judicial review of agency action is focused upon the administrative record before the agency at the time the decision was made). Accordingly, the Court will address separately each of the two test case RMPs, after reviewing some basic facts about the sage grouse.

## Sage Grouse

Sage grouse are sagebrush obligates, and rely on sagebrush all year to provide roosting, cover and food. Depending on large areas of contiguous sagebrush, they inhabit the sage-steppe ecosystem that features sagebrush in the overstory; native grasses, forbs,

and litter in the understory; and biological soil crusts filling interspaces between vegetation. During the winter months, sage grouse depend almost exclusively on sagebrush for food. As winter turns to spring, sage grouse move to breeding areas known as leks. After mating, the female moves away from the lek to establish a nest. This nesting season is critical because the sage grouse has one of the lowest reproductive rates of any North American game bird. The nest is a shallow depression on the ground, usually under sagebrush. The hen and chicks require high quality forbs, which are herbaceous flowering plants, other than grasses. The forbs provide good nutrition for the hen, increasing her chances of successfully giving birth to, and raising, her chicks. As fall comes, and turns to winter, sage grouse migrate to winter sites, gradually eating less forbs and more sagebrush, until they are eating almost exclusively sagebrush by December.

In 2001 and 2002, the Nature Conservancy conducted a detailed scientific study of sagebrush habitat in three critical areas of the Craters Monument, including the Laidlaw Park grazing allotment that will be discussed further below. Their study found that about 38% of the study area was in poor condition meaning that it was "severely altered . . . seemingly having crossed a threshold from which recovery is not possible without seeding intervention." *See Report* at p. 41. The Report noted that "[l]arge areas are at considerable risk for future degradation." *Id*.

The Report concluded that unrestricted grazing in the early 1900s was responsible for much of the depletion of native grasses and forbs in the study area, but that

"continuing problems were apparent during the study." *Id*. at p. 38. For example,

"utilization of preferred grasses and forbs" were "generally heavy within a mile of water."

*Id*. For those areas in fair condition (about 33% of the study area), the Report

recommended that "no more than light utilization and periodic rest should be allowed."

*Id*. at 38, 41.

Between 2002 and 2003, the Fish and Wildlife Service (FWS) received three

petitions to list the greater sage-grouse ( Centrocercus Urophasianus ) as an endangered

species under the Endangered Species Act (ESA). On April 21, 2004, the FWS filed its

90-day finding, concluded that the petitions present "substantial information indicating

that listing the greater sage-grouse may be warranted." *See* 69 Fed.Reg. at 21484-94. In

making that finding, the FWS relied on the declining population throughout the western

United States, the extensive habitat destruction, and the lack of regulatory mechanisms to

protect the sage grouse. *Id*.

Just two months later, the Western Association of Fish and Wildlife Agencies

(WAFWA) prepared a report entitled "Greater Sage-Grouse Conservation Assessment

(CA). It is 600 pages in length and was prepared by 11 state fish and wildlife agencies

responsible for management of sage grouse populations, and was peer-reviewed by a

group of scientists.[1]

The CA identified five core populations of sage grouse, the largest of which was

---

[1] The CA is listed in the Administrative Record for this case and hence may be considered by the Court in reviewing the decisions at issue here. *See Craters AR* at 16698.

the Wyoming Basin core population, which includes southwestern Wyoming where the BLM's Pinedale Field Office is located. Another of the core populations was located in the Snake River Plain area of south-central Idaho where the Craters of the Moon National Monument is located. The CA discussed at length the various threats to the sage grouse. The principal threat to the Wyoming Basin core population was from energy development. The CA noted that oil and gas development caused a "direct loss of [sage grouse] habitat." *Id*. at p. 7-40. Reviewing the increase in oil and gas drilling in Wyoming, the CA predicted that because 96% of all drilling permit applications are approved, "the frequency and extent of oil and gas development on sagebrush ecosystems are likely to increase . . . ." *Id*. at p. 13-7.

The principal threat to the Snake River Plain core population was destruction of habitat by fire and weed invasion. Sagebrush was being replaced by cheatgrass that dies off in the summer to become fuel for wildfires that incinerate any remaining sagebrush. Both the number of fires and the total area burned have increased dramatically in the last decade when compared with the past 100 years. *Id*. at 7-70 (Fig.7.1). According to the CA, periods of drought and global climate change could further facilitate cheatgrass invasion or exacerbate the fire regime, and thus accelerate the loss of sagebrush habitats. *Id*. at p. 7-18.

In addition, the CA found that livestock grazing depleted native forbs and grasses needed by sage grouse, and facilitated the cheatgrass invasion. *Id*. at pp. 7-26 to 7-28. Taking all these threats into consideration, the CA concluded that "we are not optimistic

about the future of sage-grouse because of long-term population declines coupled with continued loss and degradation of habitat and other factors (including West Nile Virus) ." *See CA* at p. 6-1.

About five months after the CA was issued, and in response to the FWS 90-day finding that listing of the sage grouse may be warranted, the BLM adopted its National Sage-Grouse Habitat Conservation Strategy. The BLM adopted this National Strategy to respond to the potential listing of the sage grouse and demonstrate its commitment to protecting sage grouse habitat.[2] The BLM proposed to do this by using the "land use planning process as the primary mechanism to assure that conservation strategies are implemented and further refined to address local variations and issues . . . ." *See National Strategy* at p. 19. For example, the BLM stated that its land use planning process would include "sagebrush habitat assessments that provide[] a biological basis for identifying and managing priority sage-grouse habitats (e.g. large intact native sagebrush stands, moist riparian brood-rearing site, or crucial winter ranges)." *Id*. at p. 12. With regard to grazing, the BLM stated that land use plans,

> (1) Identify objectives for vegetation goals, including those species crucial for nesting cover, brood-rearing and winter forage; (2) Determine where livestock grazing would and would not be permitted, including the season of use to meet specific requirements of sage-grouse, such as nesting in the spring . . . (6) Identify "initial levels" of livestock grazing to ensure numbers of livestock are at appropriate levels to meet land health standards.

---

[2] The BLM's National Strategy Report is not listed in the Administrative Record for this case but it is an official BLM document and hence may be considered by the Court. *See Oregon Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1112, n. 14 (taking judicial notice of official BLM documents that were not in the administrative record).

*Id*. at p. 66-67.  An appendix to the National Strategy was intended to "help BLM

planning teams include sagebrush habitat and sagebrush-dependent wildlife species

(including sage-grouse) considerations in BLM land use planning efforts."  *Id.* at § 1.3.1,

p. 2.  It recommended that land use planners consider the information in the WAFWA

Conservation Assessment, among other things.  *Id*. at p. 3.  The planning process should

include "at least one alternative that maximizes conservation of sagebrush habitat

(emphasizing special status species habitat) . . . ."  *Id*. at p. 5.  The land use plans should

"[s]ustain the integrity of the sagebrush biome . . . to maintain sustainable populations of

sage-grouse by . . . [m]aintain[ing] large patches of high quality sagebrush habitats . . .

[and by] [m]aintain[ing] connections between sagebrush habitats."  *Id*. at 5-6.  The BLM

praised the cooperative efforts of WAFWA and pledged their continuing support of

WAFWA's work in "implement[ing] conservation measures across management

jurisdictions using best available science including locally specific information."  *Id*. at p.

7.

  The BLM also designated the greater sage-grouse as a "sensitive" species pursuant

to BLM's 2001 Special Status Species Policy.  This Policy requires that "sensitive"

species be afforded, at a minimum, the same protections as candidate species for listing

under the ESA.  It called on BLM managers to "obtain and use the best available

information deemed necessary to evaluate the status of special status species in areas

affected by land use plans . . . ."  *See Policy* at § 6840.22A.  Under the Policy, those land

use plans "shall be sufficiently detailed to identify and resolve significant land use

conflicts with special status species without deferring conflict resolution to implementation-level planning." *Id*.

Meanwhile, the FWS, after further study, issued a decision on January 6, 2005, deciding not to list the sage grouse under the ESA. Following a challenge by WWP, this Court held that the FWS failed to rely on the best science and was influenced by a political appointee who intimidated the scientists in an attempt to block listing. *See WWP v. U.S. Fish and Wildlife Service*, 535 F.Supp.2d 1173 (D. Id. 2007). The Court remanded the matter to the FWS to reconsider its decision in light of the Court's findings.

In March of 2010, the FWS issued a decision that the sage grouse warrants the protection of the ESA but that listing was precluded by the need to address higher priority species first.

**Pinedale Field Office**

The BLM's Pinedale Field Office (PFO) is located in western Wyoming and covers about 1,618,140 acres of land. Over three-quarters of the PFO is dominated by the sage-steppe ecosystem, prime habitat for sage grouse. *See Pinedale EIS* at p. 3-1. Historically, this area offered abundant sage-grouse habitat, and currently, the largest sage grouse population is found in the Wyoming Basin, where the PFO is located.

Prior to the issuance of the RMP now under review, the BLM administered this area under an RMP issued in 1988. A substantial increase in oil and gas leasing and drilling in the area prompted the BLM to update the RMP. By 2004, about 61% of the federal mineral estate in the Pinedale Field Office was covered by oil and gas leases. *Id*.

at pp. 3-38 to 3-39. The Pinedale Anticline Project Area saw an increase in natural gas production of 94% between 2001 and 2006. In another area of the Pinedale Field Office, where the Jonah Infill Project was approved, the BLM authorized in 2006 the drilling of about "3,100 new wells at a rate of approximately 250 wells per year for 12 years." *See Biodiversity Conservation Alliance v BLM*. 2010 WL 3209444 at *2 (D.Wyo. 2010).

The final EIS and proposed RMP were issued in August 2008. The ROD and final RMP were issued in November of 2008. With regard to sage grouse, the EIS stated that

> [p]opulations of greater sage-grouse have declined in the planning area and some intensively developed areas no longer provide functioning sage-grouse habitats. The greater sage-grouse is a Wyoming BLM sensitive species; sage-grouse habitats should be managed to avoid the necessity of listing the greater sage-grouse in the future.

*See EIS* at p. 1-9. The EIS states that sage grouse populations are "negatively affected by energy development activities." *Id*. at p. 3-135. The EIS noted studies in the Pinedale Anticline revealing that "as development increased lek activity declined up to 100%." *Id.* There was an 18% decline in lek activity between 2001 and 2006 in the Upper Green River Basin, and the EIS attributed "part of this decline" to "increased gas development activity." *Id*. at p. 3-137. BLM policies do restrict development within a quarter-mile of a lek and during nesting and brood-rearing seasons. But the EIS noted that the policies do not preclude development after these times, and this has caused "severely fragmented habitats." *Id*. at p. 3-136. The fragmentation of the sage habitat is especially harmful to the sage grouse, the EIS observed. *Id*. at 3-135 to -136.

Consistent with these conclusions in the EIS, the leading expert on sage grouse,

Dr. Clint Braun, stated in his comments on the draft EIS that the "health of the sage grouse populations and trends in quality of the available habitats in the Pinedale Resource Area have markedly declined over at least the last 10 years." *Pinedale AR* at 6472. Moreover, the WAFWA Conservation Assessment found a decline in the sage grouse population in the Pinedale area from 1965 to 2003, with a steeper decline during the period from 2000 to 2003. *See Conservation Assessment* at pp. 6-70, A5-23.

However, the EIS did not discuss the WAFWA Conservation Assessment. In addition, the BLM did not gather any new data in preparing its EIS. *See EIS* at p. 3-1 ("no new environmental data collection efforts were conducted on BLM-administered lands specifically for this RMP"). Nevertheless, the data the EIS did examine, discussed above, appear to be consistent with the WAFWA conclusion, *i.e*, that the sage grouse population and habitat are in decline. The EIS nevertheless concludes that "[n]o reliable population estimate can be made from data collected during 2006 (or any of the previous years) because sex ratios for grouse are unknown and not all active leks have been located. An increasing population trend during 2004-2006 is indicated by an increase in the average number of males/lek and males/complex since 2003." *See EIS* at p. 3-137.

The EIS evaluated four alternatives:

(1)     Alternative 1 was the "no action" alternative ("maintains current management goals, objectives and direction as specified in the 1988 Pinedale RMP");

(2)     Alternative 2 was a "maximum energy development" alternative ("designed to evaluate the impacts of maximizing development of energy resources while

providing an adequate level of environmental protection for other resources");

(3)     Alternative 3 was described as the "most environmentally protective" alternative

        ("designed to evaluate the impacts of providing the maximum level of

        environmental protection for surface resources while allowing for the production

        of oil and gas"); and

(4)     Alternative 4 was the Proposed RMP ("designed to evaluate the impacts of

        optimizing production of oil and gas resources while providing the appropriate

        level of environmental protection for surface resources").

*See EIS*, pp. 2-21 to 2-24. Under each alternative, the lands were assigned into one of

three categories: (1) "Intensively Developed Oil and Gas Fields"; (2) "Traditional

Leasing Areas"; or (3) "Unavailable Areas." In the "Intensively Developed" areas,

emphasis was placed on "efficient and complete development and production of the oil

and gas resource." *Id*. at p. 2-50. In "Traditional Leasing Areas," emphasis would be on

"traditional multiple use management," and new oil and gas leases "would be issued with

lease terms and stipulations designed to minimize the impact of oil and gas exploration

activities on the environment and wildlife habitats." *Id.* If oil and gas

exploration/development reached certain densities (1 well every 160 acres, or 4 wells

every 640 acres), the area could be converted into an "Intensively Developed Field." *Id*.

In "Unavailable Areas," emphasis would be on "providing contiguous wildlife habitat

[and] migration routes," as well as public lands recreation and "opportunities for

appropriate non-surface disturbing activities." *Id*., p. 2-51. No new mineral leases would

be offered in these areas, but exploration and production of existing oil and gas leases could continue. *Id*. And if the same well densities above are reached, then these "Unavailable Areas" could be converted into "Intensively Developed Fields." *Id*.

The RMP's three action alternatives – leaving out the "no action" alternative – identified different acreages for these categories. The "maximum energy development" alternative was Alternative 2, and it proposed 178,420 acres as Intensively Developed Fields. In contrast, the "most environmentally protective" alternative – Alternative 3 – proposed only 78,270 acres as Intensively Developed Fields. The alternative containing the Proposed RMP – Alternative 4 – contained almost as many acres as the "maximum energy development" alternative: 175,040 acres. The EIS projected that 7,804 wells would be drilled under the "maximum energy" Alternative 2. Almost the same number of wells was estimated under the chosen alternative, Alternative 4, where 7,136 wells were estimated.

With regard to grazing, the BLM administers 219 allotments in the Pinedale Field Office. The EIS noted that 122 of those allotments were meeting the rangeland health standards, 20 allotments were not meeting the standards as a result of grazing, and 72 allotments had not been assessed. *Id*. at p. 3-33. The 20 allotments not meeting standards cover 283,508 acres of BLM land. *Id*. The total acres covered by all 219 allotments add up to 950,046 acres of BLM land. *Id*. at A21-5. These figures show that while only 9% of the allotments had actually been determined to be not meeting standards due to grazing, those allotments comprise about 30% of the allotment acres in the Pinedale Field

Office.  There was no discussion in the EIS as to why almost a third of the acres covered

by BLM allotments did not meet the standards.  The EIS did recognize the adverse effects

of grazing on sage grouse nesting and brood-rearing habitat, and on the native forbs and

grasses required by sage grouse.  But there was no discussion in the EIS as to why almost

a third of the acres covered by BLM allotments did not meet the rangeland health

standards other than to state that the failure was due to grazing.

**Craters of the Moon National Monument**

Craters of the Moon National Monument, located in south-central Idaho, was

established on May 2, 1924, for the purpose of protecting the unusual landscape of the

Craters of the Moon Lava Field.  On November 9, 2000, President Clinton through

Presidential Proclamation 7373, expanded the Monument from approximately 54,000

acres to more than 750,000 acres.  *See* 65 Fed. Reg. 69,221 (Nov. 9, 2000).  The

Proclamation placed the lands under the administration of both the National Park Service

("NPS") and the BLM, with each agency having primary management authority over

separate portions:  The NPS managed the lava fields while the BLM managed the

sagebrush steppe habitat.

Proclamation 7373 was adopted to "assure protection of . . . all objects of scientific

interest" within the expanded monument boundary.  *Id*.  These include "kipukas," which

are isolated islands of older terrain surrounded by newer lava.  *Id.*  There are over 500

kipukas within the Monument, "many of which contain relatively undisturbed native

sagebrush steppe communities."  *See Craters EIS* at p. 16.  An express purpose of the

Monument expansion, contained in Proclamation 7373, was to protect the kipukas

because of their value to science generally and to the sage grouse specifically:

> The kipukas provide a window on vegetative communities of the past that have been erased from most of the Snake River plain. In many instances, the expanse of rugged lava surrounding the small pocket of soils has protected the kipukas from people, animals, and even exotic plants. As a result, these kipukas represent some of the last nearly pristine and undisturbed vegetation in the Snake River Plain, including 700 year old juniper trees and relict stands of sagebrush that are essential habitat for sensitive sage grouse populations. These tracts of relict vegetation are remarkable benchmarks that aid in the scientific study of changes to vegetative communities from recent human activity as well as the role of natural fire in the sagebrush steppe ecosystem.

65 Fed. Reg. at 69222 (emphasis added). The Proclamation directs that the Monument

lands are to be managed so as to fulfill these stated purposes: "The Secretary of Interior

shall manage the area being added to the monument through the Bureau of Land

Management and the National Park Service, pursuant to legal authorities, to implement

the purposes of this proclamation." 65 Fed. Reg. at 69223. Among the areas added to the

Monument through Presidential Proclamation 7373 is the world's largest kipuka, known

as Laidlaw Park.

Historically, Laidlaw Park provided important habitat for sage-grouse populations

in southern-central Idaho. *See Craters EIS*, pp. 116-22, 137-39. However, Laidlaw Park

has experienced growing degradation – including loss of sagebrush habitat and weed

invasions in its southern region – caused in part by grazing of domestic livestock. *Id.*, pp.

116-17 (noting that "historic overgrazing" along with frequent wildfires, cheatgrass

invasions and noxious weeds have "negatively affected the southern half of Laidlaw

Park").

The Proclamation and subsequent U.S. Department of the Interior direction instructed the BLM and NPS to co-manage the Monument and jointly prepare a land use plan. At that time, the two agencies were administering the land in the Monument under five separate plans. To bring all management under a single plan, the agencies published a notice in 2002 of their intent to prepare a comprehensive land management plan. That plan, accompanied by an EIS, was approved by both agencies in September 2006.

The EIS noted that "substantial portions of the new Monument lands are currently in a degraded condition . . . ." *See Craters EIS* at p. 73. That degraded condition applied to sage grouse habitat and numbers. The EIS noted a 36% decrease in active leks in the last 25 years in the Monument, and a 64% decrease in the last 60 years. *See Craters EIS* at p. 137. The EIS concluded that a "major contributing factor" in the decline of sage grouse numbers is livestock grazing. *Id*. at p. 139. Grazing was "primarily responsible for the declines in forb production and declines in native perennial grass production and composition," key elements of sage grouse habitat. *Id*. at p. 233. The EIS was critical of the management of grazing: "The decline of sage grouse indicates management that is not only detrimental to sage grouse, but to their habitat and other species which use their habitat." *Id*.

Other factors destroying sage grouse habitat include wildfires and invasive weeds like cheatgrass. The EIS succinctly captured the relationship between fire, weeds, and grazing: "Fire creates ideal conditions for cheatgrass establishment, and cheatgrass is

highly flammable.  The spread of cheatgrass is exacerbated when the native perennial grass and forb community is weakened as a result of heavy livestock grazing." *Id.*, p. 234.

There are 23 grazing allotments with at least some acreage in the Monument.  The EIS showed that for the 18 allotments that were reviewed under the rangeland health standards, 10 met those standards.  That led the EIS to conclude that "[g]razing preference is not expected to decrease as a result of standards and guidelines analysis because most allotments are attaining, or making significant progress towards attaining, uniform achievement." *Id*. at p. 156.  Yet some of the largest allotments failed to meet the rangeland health standards, including the critical Laidlaw Park allotment. *Id.* at Table 21, p. 159.  Indeed, 61% of the acres of allotments within the Monument failed to meet these standards. *Id*. at Tables 20, 21, pp. 158-59.[3]  There was no discussion in the EIS of the fact that well over half of the allotment acres within the Monument were not meeting the rangeland health standards.

The EIS reported that existing grazing on BLM lands within the Monument totaled 36,965 AUMs. *Id*. at Table 20, p. 58.  Every alternative examined in the EIS – including Alternative D, the proposal that was eventually selected – called for a total of 36,985 AUMs to be authorized in the Monument.

The EIS did not address in any manner the 2004 WAFWA Conservation

---

[3] There were 176,800 acres within the Monument not meeting Standards and Guidelines, a figure that represents 61% of the total 285,700 acres of allotments within the Monument.

Assessment or the BLM's own 2004 National Sage-Grouse Habitat Conservation

Strategy, both discussed above.

## ANALYSIS

### Standing

To seek injunctive relief, a plaintiff must show that he is under threat of suffering

"injury in fact" that is concrete and particularized; the threat must be actual and imminent,

not conjectural or hypothetical; it must be fairly traceable to the challenged action of the

defendant; and it must be likely that a favorable judicial decision will prevent or redress

the injury. *Summers v. Earth Island Institute*, 129 S.Ct. 1142 (2009). The concrete harm

requirement can be satisfied by an injury to "the recreational or even the mere esthetic

interests of the plaintiff." *Id*. at 1149. Furthermore, since WWP seeks associational

standing on behalf of its members, there are three related but distinct Article III standing

requirements: An association has standing to bring suit on behalf of its members when

(1) its members would otherwise have standing to sue in their own right, (2) the interests

at stake are germane to the organization's purpose, and (3) neither the claim asserted nor

the relief requested requires the participation of individual members in the lawsuit.

*Western Watersheds Project v Kraayenbrink*, 632 F.3d 472, 482-83(9th Cir. 2011).

For substantive claims related to environmental harms – such as the FLPMA claim

here – an association member may establish an injury in fact by showing "a connection to

the area of concern sufficient to make credible the connection that the person's life will be

less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or

recreational satisfaction—if the area in question remains or becomes environmentally degraded." *Id*. at 484. He must show that he "had repeatedly visited an area affected by a project, that he had concrete plans to do so again, and that his recreational or aesthetic interests would be harmed if the project went forward without his having the opportunity to appeal." *Wilderness Society, Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010). Where the recreational use of a particular area has been extensive and in close proximity to the plaintiff, an affiant's expressed intention to continue using the land "is sufficiently concrete to underwrite an injury-in-fact." *Id.* "Nonetheless, a vague desire to return to the area "without any description of concrete plans, or indeed any specification of when the some day will be" does not support a finding of actual or imminent injury." *Id.*

To make out a procedural claim – such as the NEPA claim here – an individual "must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Kraayenbrink*, 632 F.3d at 485. The concrete interest test has been described as "requiring a geographic nexus between the individual asserting the claim and the location suffering an environmental impact." *Id.* "Once a plaintiff has established an injury in fact under NEPA the causation and redressability requirements are relaxed." *Id.* "[T]he members must show only that they have a procedural right that, if exercised, could protect their concrete interests . . . ." *Id.*

With those standards in mind, the Court turns to consider the standing Declarations submitted by WWP. With regard to the PFO, WWP filed the Declaration of Jonathan

Ratner.  *See Ratner Declaration (Dkt. 90-10).*  Ratner states that (1) he is a member of WWP and is employed as their Wyoming Office Director, (2) he lives and works in the PFO area and drives through a major oil and gas field development in the PFO to "go to the grocery store or to the post office", *id*. at ¶ 5; (3) his employment duties "obligate[] [him] to spend a substantial portion of my time on the public lands of the Pinedale Field Office", *id*. at ¶ 6; (4) he hikes and camps in the PFO and is "enriched and spiritually rejuvenated by the aesthetics of a healthy sagebrush ecosystem and the spiritual value of knowing that many species, including sage-grouse . . . inhabit the areas [he] work[s] in", *id*. at ¶ 15; and (5) as part of his employment duties, he has monitored grazing in the PFO, and its impacts on the environment there have affected his esthetic interests, *id*. at ¶¶ 9, 65-68.

The Ratner Declaration establishes the standing of WWP to challenge the Pinedale RMP under the standing standards set forth above.  Ratner has alleged an injury to his recreational and esthetic interests in the PFO.  Because he lives and works in the area, he has expressed more than a "vague desire to return to the area," *Wilderness Society*, 622 F.3d at 1256.  His interests are allegedly injured by the very actions being challenged, and so his Declaration satisfies the requirement of a "geographic nexus between the individual asserting the claim and the location suffering an environmental impact."  *Kraayenbrink*, 632 F.3d at 485.

With regard to the Craters of the Moon National Monument, WWP submitted the Declaration of Jon Marvel.  *See Marvel Declaration (Dkt. 90-7).*  Marvel states that (1) he

is a co-founder of WWP, *id*. at ¶ 5; (2) he has visited the public lands of the Craters of the Moon National Monument and Preserve "each year for the past 41 years", *id*. at ¶ 12; (3) he is "deeply concerned about the impacts of livestock grazing" on the Craters area and has written "numerous comments to the BLM" on this subject, *id*. at ¶ 13; and (4) he uses the Craters area for "a variety of professional, personal, recreational, aesthetic, spiritual, and other purposes", *id*. at ¶ 7. This Declaration meets the standing requirements set forth above to allow WWP to challenge the Craters RMP.[4]

The Intervenors Wyoming Stock Growers Association and the Petroleum Association of Wyoming argue, however, that these alleged injuries are not imminent because the RMPs are programmatic land use plans that do not authorize any specific action to take place on the ground. The Court disagrees. The Crater and Pinedale RMPs govern grazing permits, determine where grazing will or will not be allowed, and set environmental standards that all grazing permits must meet. *See* 43 U.S.C. § 1732(a) (requiring management to be "in accordance with the [RMPs]"); § 1752(c)(1) (conditioning renewal of grazing permits on lands remaining available for grazing in accordance with RMPs). The BLM itself recognizes this by observing in its briefing that the RMP "identifies a specific level of grazing AUMs for all the Pinedale allotments." *See BLM Brief (Dkt. 107)* at p. 22. This means that the RMPs have immediate effects on

---

4  The Court also finds that the other requirements for associational standing are present: The interests at stake are pertinent to the interests of WWP, and there is no indication that resolving this case would require or even be aided by the participation of WWP's individual members. *Western Watersheds*, 632 F.3d at 482-83. Moreover, WWP's claims under NEPA and FLPMA fall within the statutes' respective zones of interest. *Id.*

the ground, and so the injuries alleged by WWP are imminent for standing purposes.

The Ninth Circuit was faced with a similar situation in *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1516 (9th Cir. 1992):

> [I]f the agency action only could be challenged at the site-specific development stage, the underlying programmatic authorization would forever escape review. To the extent that the plan pre-determines the future, it represents a concrete injury that plaintiffs must, at some point, have standing to challenge. That point is now, or it is never.

More recently, the Circuit again rejected a similar argument in *Kraayenbrink*. There, WWP was also the plaintiff, and it challenged the BLM's adoption of nationwide grazing regulations that, among other things, lowered the standards, and softened the consequences, for grazing violations. WWP's lawsuit challenged those regulations on their face, not as applied to any specific grazing allotment. The Circuit had to determine – as this Court does – whether WWP had standing to challenge an agency's programmatic rule before it was actually applied in a specific case.

*Kraayenbrink* reviewed WWP Declarations – including one submitted by Jon Marvel, who also submitted a similar Declaration in the present case. The Circuit found that those Declarations demonstrated that the regulations under attack "pose an imminent harm to [WWP's] members' aesthetic enjoyment of the rangeland and to their involvement in public land grazing management." *Id*. at 485. Accordingly, the Circuit held that WWP had standing.

The same analysis applies here. The Court therefore finds that WWP has standing.

**Motions to Strike**

Memorandum Decision & Order – page 21

Intervenors have moved to strike portions of Declarations filed by WWP on the standing issue. The Declarations at issue were filed by Paul McClain, Jonathan Ratner, Jon Marvel, and Louise Lasley. As is clear from the discussion above, the Court only relied on portions of the Marvel and Ratner Declarations. The portions relied upon by the Court – and discussed in detail above – are not challenged in this motion to strike. The Court did not rely upon the challenged statements. Hence, the Court will deem this motion moot.

The BLM seeks to strike any reference to the FWS's 2010 finding that listing of the sage grouse was warranted but precluded. The BLM argues that this finding came after the Crater and Pinedale RMPs were issued and therefore cannot be considered in this administrative review action. As is clear from this decision, the Court mentions the FWS finding in a single sentence to describe the historical context of this case. The Court did not consider the FWS finding for any substantive purpose in reviewing the two RMPs, as will be apparent in the discussion below.

The other matters sought to be stricken by the BLM – the photo of the Jonah Field, and the portions of certain Declarations discussed above in relation to the intervenors' motions to strike – were not considered by the Court. Accordingly, the Court will deem the BLM's motion to strike as moot.

## Motion For Partial Remand

The BLM has moved this Court for a partial remand. The BLM seeks to have remanded that portion of the case challenging the Craters EIS. The BLM seeks the

remand,

> so that the BLM may initiate a land use plan amendment and NEPA process
> to reconsider and reevaluate its decisions concerning livestock grazing and
> protections for sage-grouse and sage-grouse habitat in connection with
> BLM-administered lands within the Craters of the Moon National Monument.
> In support of this process, BLM intends to prepare an EIS that will consider
> and evaluate, among other things, a range of reasonable livestock grazing
> alternatives, as well as issues related to grazing management and sage-grouse
> conservation. The EIS will consider available information and data, including
> relevant available information and data on vegetative conditions and
> sage-grouse populations, and will address and consider applicable BLM
> policies concerning livestock grazing and sage-grouse conservation (e.g.,
> BLM's revised Special Status Species Policy and National Sage-Grouse
> Habitat Conservation Strategy).

*See BLM Brief in Support of Motion for Partial Remand* at p. 3. The BLM has not,

however, admitted any error, and it wants to keep the present Craters RMP in place

during the period it will be working on a new RMP. Meanwhile, the Craters RMP at

issue in this action authorizes a certain level of grazing on the Monument and thus has an

immediate effect on the ground. Moreover, it would guide any site-specific projects until

the new RMP might be completed, a period that could last for years. The remand that the

BLM desires would do nothing more than strip WWP of its right under the APA to

challenge a final agency action that has immediate and continuing effects. The BLM

cites no authority to support such action. Accordingly, the Court will deny the motion for

partial remand, and proceed to review the Craters EIS under NEPA.

## NEPA Analysis – Craters EIS

NEPA requires that an EIS must "provide full and fair discussion of significant

environment impacts of the proposed actions and shall inform decision-makers and the

public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." *See* 40 C.F.R § 1502.1. That discussion serves two purposes:

> First, it ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts. Second, it guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision.

*Oregon Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1099 (9th Cir. 2010) (*"ONDA"*), quoting *Dept. of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004). To fulfill this mandate, the EIS must "consider every significant aspect of the environmental impact of a proposed action," including the direct, indirect, and cumulative impacts. *Id*., at 1100. "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b).

Because the EIS guides decision-making, "the alternatives analysis is naturally the 'heart of the environmental impact statement'." *ONDA*, 625 F.3d at 1100, quoting 40 C.F.R. § 1502.14. The EIS must "rigorously explore and objectively evaluate all reasonable alternatives," and the "existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Id.* The "touchstone" for courts reviewing challenges to an EIS under NEPA "is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *Id.* at 1122. An EIS "cannot be found wanting simply because the agency failed to include every alternative device thought conceivable by the mind of man." *Id.* Still, "[t]he

existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Id.*

The Craters EIS did not discuss in any manner alternatives that reduced grazing short of a total ban; it did discuss, but refused to analyze, a "no grazing" alternative. Yet grazing was found to be a "major contributing factor" to the decline of sage grouse habitat. While the EIS found that grazing should not be decreased because "most" of the allotments were meeting rangeland health assessments, the data in the EIS showed that 61% of the acres in the Monument failed to meet those standards. In particular, the Laidlaw Park allotment – the world's largest kipuka – failed to meet those standards and yet no alternative considered reducing grazing there or otherwise discussed that failure in proposing mitigation measures.

Under NEPA, an agency must articulate a "rational connection between the facts found and the conclusions made*." Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 964 (9th Cir. 2005) quoting *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1170 (9th Cir.2004). Given the fact that most of the acreage in the Monument failed to meet the rangeland standards, it is misleading to justify existing grazing levels by noting that "most" allotments meet those standards.

The EIS was also deficient for failing to address the BLM's Special Status Species Policy and the National Strategy, discussed above. Both documents emphasize the importance of protecting sage grouse habitat in the land use plan. In other words, the BLM's own policies stress the need to avoid waiting for the site-specific project to

consider sage grouse habitat protections, and to consider those issues in the programmatic

land use planning process. These documents, when read together, urge BLM land use

managers to use the best available science available in (1) localized studies (such as the

Nature Conservancy Report, discussed above) and (2) the WAFWA Conservation

Assessment, discussed above.

Yet the EIS failed to consider either report. The Nature Conservancy Report

studied critical sage grouse habitat in the Monument, and concluded that light utilization

and periodic rest were necessary to restore some areas. But there is no mention of this

Report in the EIS analysis of grazing impacts. The EIS also completely failed to discuss

the WAFWA Conservation Assessment. There is no dispute that it contains the best

available science on protecting sage habitat.

This Court is, of course, foreclosed from masquerading as an expert and choosing

what it deems is the best result. *See Lands Council v. McNair,* 537 F.3d 981, 987 (9th

Cir.2008) (en banc), abrogated on other grounds by *Winter v. Natural Res. Def. Council,*

*Inc*., 555 U.S. 7 (2008). In this case, however, the EIS did not discuss and reject the

Nature Conservancy Report and the WAFWA Conservation Assessment; it completely

ignored both reports, without explaining why, and despite the agency's own urging in its

Special Status Policy and National Strategy that such reports should be considered in

developing land use plans. The EIS therefore violated NEPA's requirement to "present

complete and accurate information to decision makers and the public to allow an

informed comparison of the alternatives considered in the EIS." *NRDC v. U.S. Forest*

*Service*, 421 F.3d 797, 813 (9th Cir. 2005).

The BLM argues that the National Strategy and the Special Status Policy are mere guidelines rather than requirements. Regardless, they are both official BLM policies that on their face apply to the Craters EIS but were not discussed in that NEPA document. At the very least, NEPA requires the BLM to discuss its own official policies that on their face apply directly to the review at issue. *See ONDA*, 625 F.3d at 1115-16 (holding that court could examine agency official policies in determining adequacy of EIS).

The EIS does attempt to justify its continuation of existing grazing levels by noting that all allotments must eventually satisfy the rangeland health assessments. But waving away current problems by assuming future corrections violates NEPA's requirement that the agency take a hard look at "every significant aspect of the environmental impact." *ONDA*, 625 F.3d at 1100.

Under these circumstances, the EIS's failure to consider any alternative that would have reduced grazing violates NEPA's requirement, discussed above, that it "rigorously explore" all "reasonable alternatives." In addition, the refusal to analyze a "no grazing" alternative was arbitrary and capricious. The BLM based its refusal on its interpretation of the Proclamation that banning grazing would be "inconsistent" with its language. There is, however, no language in the Proclamation forbidding a consideration of a "no grazing" alternative. The Proclamation simply states that present laws "shall continue to apply with regard to the lands in the Monument administered by the [BLM]." *See Proclamation 7373*. The "present law" at the time the Proclamation was signed was that

the BLM had the authority to "reclassify and withdraw range land from grazing use." *Public Lands Counsel v. Babbitt*, 529 U.S. 728, 742 (2000). Accordingly, the BLM is free to consider a "no-grazing" alternative in Monument lands. No contrary language appears in the Proclamation. Thus, even applying the highest level of deference to the BLM's interpretation, the Court finds that it is incorrect as a matter of law. *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). An agency's interpretation "does not control, where . . . it is plainly inconsistent with the regulation at issue." *Native Ecosystems*, 418 F.3d at 959.

This case is very similar to one resolved by Judge Edward J. Lodge of this District in *WWP v. Rosenkrance*, No. 04:09-cv-298-EJL (D. Idaho January 15, 2011). There, Judge Lodge held that BLM acted arbitrarily and capriciously in not considering alternatives of either no grazing or reduced grazing when re-authorizing grazing permits. *See Memorandum Decision (Dkt. 37)* at pp. 21-23. That decision finds that the BLM misinterpreted its own regulations as supposedly precluding analysis of a "no grazing" alternative when the existing land use plan authorized grazing on the allotment. *Id.* & n. 9. The BLM has similarly misread the Proclamation in this case to preclude a "no grazing" alternative.

For all of these reasons, the Court finds that with regard to the Craters EIS, the BLM violated NEPA by (1) failing to consider a no-grazing alternative, (2) failing to consider the Nature Conservancy Report and the WAFWA Conservation Assessment, (3) failing to fully discuss the Special Status Species Policy and the National Strategy, and

(4) failing to consider any alternative that would have reduced grazing levels.

**NEPA – Pinedale EIS**

WWP challenges the Pinedale EIS under NEPA.  The BLM and intervenors argue that the NEPA claims are moot because the BLM has published notice in the Federal Register indicating that it intends to prepare an EIS and amend six RMPs in Wyoming, including the Pinedale RMP, in order to revise sage-grouse and sagebrush management direction for those RMPs.  *See* 75 Fed. Reg. at 30054-55 (May 28, 2010).[5]  This does not moot WWP's challenge, however.  The RMP at issue will remain in full force and effect during the years that the revision process is underway.  As the Court discussed more fully above, the RMPs determine where grazing will or will not be allowed and set environmental standards that all grazing permits must meet.  Because the RMPs will govern grazing for years until the new RMPs are completed, the controversy remains alive.  The Court therefore rejects the mootness argument, and will turn to evaluate the Pinedale EIS under NEPA.

NEPA's implementing regulations require a discussion of the cumulative impact of the project, defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ."  Cumulative impacts "can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7.  A proper

---

[5]  The Wyoming intervenors have raised this argument in their briefing on a motion to dismiss (docket no. 87) and in their briefing on their cross-motion for partial summary judgment (docket no. 100). The Court will resolve both motions in this decision.

consideration of the cumulative impacts of a project requires " some quantified or detailed information; . . . [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Klamath-Siskiyou Wildlands Center v. BLM,* 387 F.3d 989, 993 (9th Cir. 2004). The analysis "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Id.* It should explain how "individual impacts might combine or synergistically interact with each other to affect the . . . environment." *Id*. at 997.

The data presented in the Pinedale EIS, discussed at length above, at least raises a serious question that the sage grouse population, along with its habitat, is in decline in the Pinedale Field Office. The Pinedale EIS concludes that "[i]mpacts on wildlife would likely occur under all alternatives because of substantial loss of vital, high-value habitats." *EIS* at 4-294.

Two factors in this loss of habitat, identified by the EIS, are energy development and grazing. *Id.* In particular, "[l]ivestock grazing practices would further increase cumulative impacts through direct competition for forage, water, and space, and by limiting the ability to manage vegetation for wildlife needs. These impacts would also reduce the capability to maintain current population objectives. . . ." *Id.* As discussed earlier, almost a third of the Pinedale allotment acreage fails to meet rangeland health standards because of grazing impacts. With regard to energy development, the EIS concluded that,

[m]any areas leased for oil and gas development are located in areas of greater sage grouse lek concentration; therefore, related development activities that take place in these areas would likely cause long-term displacement of sage-grouse through habitat loss and lek abandonment. This would contribute to current population declines, resulting in potentially significant impact on greater sage grouse.

*Id*. at 4-296.

The EIS discussed generally how energy development and grazing would contribute to the decline of the sage grouse without identifying how or where those impacts would occur. Dr. Braun, in comments to the BLM during the RMP revision process, demonstrated the importance of locating and mapping winter use areas throughout the RMP area for the sage grouse. *Pinedale AR* at 24410, pp. 4-5. The EIS did not provide that mapping. Similarly, there was no identification of the locations adversely affected by grazing. While the EIS data showed that nearly a third of the allotment acres failed to meet rangeland health standards due to grazing, there was no discussion in the EIS of that data, or how it would "synergistically interact" with energy development to affect the sage grouse. Dr. Braun concluded that the cumulative impacts of energy development, grazing, and other factors would be detrimental to sage grouse, but his conclusions were not addressed. As discussed above, the BLM must be able to follow the advice of its own experts when faced with differences of opinions among experts, but here the BLM points to nothing in the Administrative Record that rebuts the testimony of Dr. Braun, a leading expert on the sage grouse.

The cumulative impacts of energy development are critical to sage grouse. The

EIS was faced with substantial energy development not only in the Pinedale Field Office but also in the adjoining Kemmerer Field Office. *See 72 Fed. Reg. 58113* (2007) (providing notice of draft EIS for Moxa Arch Area Infill Gas Development Project in the Kemmerer Field Office covering 475,808 acres). Yet there was no cumulative impact analysis of that development. The BLM's own National Strategy called for a regional analysis, and the BLM had conducted one that is in the Administrative Record. *See Pinedale AR* 33643 (the "Wyoming Basin Eco-Regional Assessment"). But it was ignored in the Pinedale EIS, as was the WAFWA Conservation Assessment.

For all of these reasons, the Court finds that the Pinedale EIS failed to conduct a proper cumulative impact analysis and hence violated NEPA.

**FLPMA**

WWP also challenges the Craters EIS and the Pinedale EIS under FLPMA. That statute requires the BLM to "develop, maintain, and, when appropriate, revise [RMPs]." 43 U.S.C. § 1712(a). Among other requirements, the RMPs are to (1) "use and observe the principles of multiple use and sustained yield"; (2) "use a systematic interdisciplinary approach"; (3) "give priority to the designation and protection of areas of critical environmental concern"; and (4) "weigh long-term benefits to the public against short-term benefits." 43 U.S.C. § 1712(c). The BLM "shall manage the public lands" in accordance with these plans. *Id*. § 1732(a).

To ensure that the BLM has adequate information to perform this task, FLPMA also directs that:

The Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern. This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values.

*Id*. § 1711(a). The BLM, in other words, is obligated to "arrange for resource, environmental, social, economic and institutional data and information to be collected, or assembled if already available." 43 C.F.R. § 1610.4-3.

In accordance with these directives, the BLM drafted and adopted the Special Status Species Policy and the National Strategy, discussed above. Both documents emphasize the importance of protecting sage grouse habitat in the RMP, and not waiting to resolve conflicts until site-specific projects are proposed. In the National Strategy – adopted to avoid listing of the sage grouse under the ESA – the BLM stated that it "will use the land use planning process as the primary mechanism to assure that conservation strategies are implemented" to protect the sage grouse. *See National Strategy* at p. 19. Under the Special Status Species Policy, RMPs "shall be sufficiently detailed to identify and resolve significant land use conflicts with special status species without deferring conflict resolution to implementation-level planning." *See Policy* at § 6840.22A.

As discussed above, the BLM disregarded both the Special Status Species Policy and the National Strategy in the Craters and Pinedale RMPs. It does not matter whether the Policy and Strategy contain requirements or only guidelines – either way, the BLM violates FLPMA by completely disregarding its own policies on the drafting of RMPs

without discussion or analysis in the RMPs at issue or the accompanying EISs. *See Atchinson v. Wichita Board of Trade*, 412 U.S. 800, 808 (1973) (where agency modifies or overrides its longstanding precedents or policies, it "has the duty to explain its departure from prior norms").

The BLM argues, however, that WWP's challenges to the RMPs are not ripe under *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998). That case requires the Court to resolve a ripeness challenge by considering "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Id.* at 733.

In *Ohio Forestry*, the plaintiffs brought a challenge under the National Forest Management Act (NFMA) to a Forest Service land use plan for allowing too much logging. The Supreme Court held that the challenge was not ripe because the land use plan itself did not cause any specific logging project to go forward, and any future logging would have to be preceded by a site-specific study that could be challenged at that time.

Critically, the plaintiffs in *Ohio* failed to argue that the Forest RMP caused any injury. The Supreme Court declared that this failure was "significant" because the Forest Service had conceded that if the "plan was allowing motorcycles into a bird-watching area or something like that, that would be immediately justiciable." *Id.* at 739.

In this case, WWP does allege immediate harm. As discussed above, the Craters

and Pinedale RMPs set grazing AUM limits and thus have an immediate effect on the ground.  Moreover, the BLM's own policies – contained in the National Strategy and Special Status Species Policy – stress the need to avoid waiting for the site-specific project to consider sage grouse conservation measures, and to consider those issues in the programmatic RMP process. These circumstances were not present in *Ohio Forestry*. The FLPMA challenge in this case "can never get riper" and hence is distinguishable from the NFMA claim in *Ohio Forestry.  Id*. at 737.

It is true that the RMPs are being reconsidered by the BLM, and one factor this Court must consider under *Ohio Forestry*, as listed above, is whether judicial intervention would inappropriately interfere with further administrative action.  Once again, the key fact present here – and absent in *Ohio Forestry* – is that the RMPs at issue have immediate and continuing effects.  Certainly the Court's decision in this case may have a substantial effect on the review process by identifying the commands of NEPA and FLPMA.  But to abstain would be to strip WWP of its right under the APA to challenge final agency action that is causing immediate and continuing effects.  Under these circumstances, a judicial declaration of the law cannot be deemed an "inappropriate interference."

## Conclusion

In accordance with the analysis above, the Court will (1) grant WWP's motion for partial summary judgment; (2) deny the BLM's motion for partial remand; (3) deny the motions for partial summary judgment filed by the BLM and the intervenors; (4) deny the

motion to dismiss or stay the proceedings on the Wyoming RMPs; and (5) deem moot the motions to strike.[6]

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for partial summary filed by plaintiffs (docket no. 90) is GRANTED.

IT IS FURTHER ORDERED, that the motions for partial summary judgment filed by the BLM (docket no. 107) and intervenors (docket nos.100 & 104) are DENIED.

IT IS FURTHER ORDERED, that the motion to dismiss or to stay (docket no. 87) is DENIED.

IT IS FURTHER ORDERED, that the BLM's motion for partial remand (docket no. 108) is DENIED.

IT IS FURTHER ORDERED, that the motion to intervene by the state of Idaho as to remedy only (docket no. 74) is GRANTED.

IT IS FURTHER ORDERED, that the motion for reconsideration re intervention filed by the state of Utah (docket no. 86) is GRANTED IN PART AND DENIED IN PART. Utah is granted the right to intervene for remedy purposes only.

---

[6] The Court also has before it motions to intervene by the states of Utah and Idaho. Idaho seeks to intervene as to remedy only and the Court will grant that motion. Utah seeks to intervene as to liability and as to remedy. In this case, the existing parties submitted over 500 pages of briefing on the liability issues, along with an administrative record contained on three separate CDs. All angles of the liability issues were exhaustively presented to the Court, and the submissions were nearly overwhelming. Certainly, no viewpoint was lacking. Given these unique circumstances, the Court will grant Utah the right to intervene as to remedy only.

IT IS FURTHER ORDERED, that the motions to strike (docket nos. 103 & 110) are DEEMED MOOT.

DATED:  **September 28, 2011**



Honorable B. Lynn Winmill
Chief U. S. District Judge