IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, | |
| Plaintiff, | Case No.  4:08-CV-516-BLW |
| v. | **MEMORANDUM DECISION AND ORDER** |
| KEN SALAZAR, Secretary, DEPARTMENT OF THE INTERIOR, | |
| Defendants. | |

## INTRODUCTION

The Court has before it a motion for remedies filed by WWP.  The Court held an evidentiary hearing and requested further briefing.  That briefing has been received and the motion is at issue.  For the reasons set forth below, the Court will (1) remand all issues concerning the Craters of the Moon Resource Management Plan (RMP) and the Pinedale RMP to the BLM, without vacatur, for the purpose of revising both RMPs; (2) deny WWP's request to impose interim measures to manage grazing and drilling during the time the RMPs are being revised; (3) order the BLM to complete the new Craters RMP by the end of 2014, and to complete the Pinedale RMP by the end of 2016.

## LITIGATION BACKGROUND

In its complaint, plaintiff WWP challenges sixteen separate BLM RMPs and the Environmental Impact Statement (EIS) associated with each RMP.  These RMPs and EISs were prepared by separate BLM offices in six different states: (1) Idaho; (2)

**Memorandum Decision & Order – page 1**

Montana; (3) Utah; (4) California; (5) Wyoming; and (6) Nevada. The lands associated with the sixteen RMPs comprise the range of the sage grouse, and WWP alleges that each of the challenged RMPs, and their associated EISs, fail to adequately consider the environmental impacts of grazing and energy development on the sage grouse.

WWP's claims are brought pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, for alleged violations of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370h, and the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1700-1787.  To streamline the case, WWP and the BLM proposed, and the Court subsequently approved, a case management plan under which the parties would brief initial summary judgment motions concerning two "test case" RMPs – the Craters of the Moon RMP and the Pinedale RMP.

Those motions were filed, and the Court issued its decision on September 28, 2011. *See Memorandum Decision (docket no. 131).*  With regard to Craters, the Court found that although grazing was deemed by the agency to be a major contributing factor to the decline of sage grouse habitat, the RMP/EIS failed to adequately address the best science and the agency's own policies designed to protect that habitat.  Moreover, the RMP/EIS failed to discuss alternatives to the status quo regarding grazing.  More specifically, the Court found that the Craters EIS violated NEPA and FLPMA by failing to adequately address the Nature Conservancy Report, the WAFWA Conservation Assessment, and the BLM's own Special Status Species Policy ("Policy") and National Sage-grouse Habitat Conservation Strategy ("Strategy").  The BLM also failed to

**Memorandum Decision & Order – page 2**

consider a no-grazing alternative or any alternative that would have reduced grazing levels.

With regard to the Pinedale RMP/EIS, the Court found that it failed to (1) identify how or where energy and grazing impacts to sage-grouse would occur; (2) map sage-grouse winter use areas; (3) adequately discuss the failure of one third of allotment acres to meet rangeland health standards due to grazing; (4) address the conclusions of Dr. Braun regarding cumulative impacts to sage-grouse ; (5) analyze the cumulative impacts due to energy development, including energy development in adjoining field offices such as the Kemmerer Field Office; and (6) address the Wyoming Basin Eco-Regional Assessment and the WAFWA Conservation Assessment.  In addition, the Court held that BLM violated FLPMA by disregarding its own Policy and Strategy.

Following that decision, the parties briefed the remedy issues, and the Court held a three-day evidentiary hearing on remedies.  The Court ordered further briefing that has now been received.

WWP seeks three forms of relief.  It asks first for the Court to remand this case to the BLM, without vacating the RMPs for Craters and Pinedale, to correct the deficiencies in those RMPs.  All parties agree to this, and the Court will so order.

WWP asks next for the Court to impose certain procedures and a timeline on the BLM during the remand.  The BLM has proposed a timeline that WWP finds acceptable. The BLM proposes that the remand for the Pinedale RMP be completed by the end of 2014. *See Green Declaration (Dkt. No. 167-5)* at ¶ 13.  For Craters of the Moon, the

BLM wants 4.5 years to complete the remand process because it proposes a "two-step" process, whereby it will first complete a sub-regional EIS and RMP amendment process as part of its National Planning Strategy, and then complete a Craters of the Moon-specific EIS and RMP amendment process. The BLM agrees that the Court can impose this time line, and the Court will so order.

The BLM also proposes to use procedures on remand that are largely agreeable to WWP. Those procedures were set forth in the Declaration of Brent Ralston, who is the Planning and Environmental Coordinator for the BLM's Idaho State Office, and in the testimony and Declaration of Buddy Green, the Deputy State Director, Resource Policy & Management, for the BLM's Wyoming State Office. *See Ralston Declaration (Dkt. No. 167-9)* at ¶¶ 8-22; *Green Declaration (Dkt. No. 167-5)* at ¶¶ 7-18. WWP agrees with these procedures as far as they go, but demands that the BLM do more, as will be discussed further below. With regard to the procedures discussed by both Ralston and Green, the Court does not have the record before it that would allow the Court to micro-manage the BLM's drafting of the new RMPs by imposing each of these procedures on the BLM. However, the Court will put the parties on notice that the decision it reaches here on other issues relies in large part on the BLM's representation that it will carry out the procedures presented in the two Declarations cited above.

One specific concern of both parties concerning the remand is the use BLM will make of the National Technical Team Report (NTT Report) in revising the RMPs. The NTT Report was the BLM's response to the Fish and Wildlife Service's "warranted but

precluded" listing determination.  In that determination the FWS concluded that the

BLM's "existing regulatory mechanisms" were inadequate to protect the sage grouse.

*See* 75 Fed. Reg. 13910-01 at 13982 (March 23, 2010).  The BLM's RMPs were one of

those "existing regulatory mechanisms."  *Id.* at 13975-76.

To counter that criticism, the BLM assembled the National Technical Team, a

group of scientists, to serve "as an independent, technical and science-based team to

ensure the best information related to greater sage-grouse management is fully reviewed,

evaluated and provided to the BLM for consideration in the land use planning process."

*See NTT Report (Dkt. No. 167-6)* at p. 2.  The Team issued its Report on December 21,

2011, and the testimony at the evidentiary hearing established that it contains the best

available science concerning the sage grouse.

The BLM will consider the NTT Report in revising the RMPs.  The BLM

announced its policy in a memorandum to its Field Offices, issued just a week after the

NTT Report, stating that the NTT Report's "conservation measures must be considered

and incorporated into at least one alternative in the land use planning process."  *See BLM

IM-2012-044 (Dkt. No. 167-7)* at p. 2.  While it will consider the NTT Report, the BLM

will not commit to adopting any of its recommendations, and will not use the NTT Report

to govern management of these two Field Offices in the interim period while the RMPs

are being revised.

This interim period – two years in Pinedale and 4.5 years in Craters – is now the

focus of the dispute between the parties.  WWP has proposed management measures that

restrict grazing and drilling during this interim period, while the BLM and intervenors object to those measures. The evidentiary hearing focused entirely on this issue.

WWP's interim measures would: (1) exclude livestock grazing in sage-grouse nesting and brood-rearing habitats from March 1 until after June 20, and remove livestock by August 1 of each year; (2) leave at least 70 percent of the herbaceous production each year to form residual cover to benefit sage-grouse nesting the following spring; (3) prohibit twice-over grazing systems in sage-grouse habitats; (4) prohibit the BLM from allowing conversion of current "unavailable" or "traditional leasing" areas into "intensively developed" areas for oil and gas leasing and development; (5) prohibit BLM from issuing or renewing mineral leases within sage-grouse habitat; (6) prohibit surface disturbance and noise within 3.3 miles of occupied leks or in identified sage-grouse winter habitat; (7) prohibit  more than 1 percent new surface disturbance per square mile; and (8) prevent wind farms within 5 miles of occupied leks.

There is no dispute that each of WWP's interim measures would benefit sage grouse. The leading expert on sage grouse, Dr. Clint Braun, explained how these measures would restore sage grouse habitat, and protect leks and nests, by reducing the negative impacts of energy development and early spring grazing. WWP's interim measures also find strong support in the NTT Report recommendations. WWP asserts that its measures are the best way to protect the sage grouse from irreparable harm

The BLM responds by describing its own interim measures, but does not assert their superiority. The BLM argues that Court must determine not the broad issue as to

which measures are best but the narrow issue as to whether irreparable harm will result if WWP's measures are not adopted.

These competing arguments define the threshold question this Court must answer: What is the legal standard governing the Court's review of WWP's proposed interim measures?

## LEGAL STANDARD

To be entitled to an injunction as a remedy for a NEPA and FLPMA violation, WWP must show (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships, a remedy in equity is warranted; and (4) that the public interest would not be dis-served by injunctive relief. *Monsanto Co. v. Geertson Seed Farms*, 130 S.Ct. 2743, 2756 (2010).

WWP is seeking a mandatory injunction requiring the BLM to take affirmative actions to manage grazing and drilling. In general, mandatory injunctions are "particularly disfavored" and not granted "unless extreme or very serious damage will result." *Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011). Moreover, injunctive relief "must be tailored to remedy the specific harm alleged." *Id.* A district court abuses its discretion by issuing an "overbroad" injunction. *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012).

The specific harm alleged here was that the RMPs were deficient. To remedy those deficiencies, the Court will order, and the BLM is already proceeding with, a

revision of the RMPs.  The additional remedy sought by WWP – detailed interim measures governing drilling and grazing on each allotment within the two Field Offices – will not cure the RMP deficiencies.  Instead, WWP's interim measures are designed to remedy alleged deficiencies in BLM's management of grazing and drilling permits at the allotment level.  However, those alleged management deficiencies – unlike the deficiencies in the RMPs – have never been evaluated by the Court.  For example, WWP wants to restrict spring or twice-over grazing in all the allotments in the Pinedale Field Office.  Yet the Court has never been asked to conduct an evaluation of each allotment in Pinedale to determine the condition of habitat and the need for such measures.  What little information the Court has concerning specific allotments in Pinedale shows that some allotments are meeting rangeland health standards while others are not.  *See Exhibit 2016.* WWP seeks to impose its restrictions even on allotments meeting rangeland health standards, but the Court has no information on those allotments to justify such measures.

Under these circumstances, a remedy that goes beyond fixing the deficient RMPs to impose grazing restrictions on all allotments would not be "tailored to remedy the specific harm alleged." *Park Village*, 636 F.3d at 1160.  To impose specific grazing and drilling restrictions at the allotment level – without ever having evaluated those allotments – would be to issue an "overbroad" injunction.  *McCormack,* 694 F.3d at 1019.

There remains, however, the stark fact, as found by the FWS, that sage grouse populations are in a precarious decline.  It was the BLM's own deficient preparation of the RMPs that has caused this interim period to exist.  If during this interim period, the

only thing standing between sage grouse and irreparable harm is WWP's proposed interim measures, an injunction may be warranted.

Under this analysis, however, the injunction does not issue simply because WWP's proposals are better for the sage grouse than the BLM's proposals. The injunction only issues if during the interim period – two years in Pinedale and about five years in Craters – sage grouse would suffer irreparable harm if WWP's proposals are not adopted. That is the standard the Court will apply in the following analysis of each Field Office.

## ANALYSIS

### Pinedale

The central problem in Pinedale, identified in the Court's earlier decision, is fragmentation and destruction of sage grouse habitat caused by drilling and grazing. *See WWP v Salazar, supra* at *4-7. WWP's interim measures were designed to reduce the impacts of drilling and grazing. For example, one of those measures would prohibit drilling – with its associated noise and surface disturbances – within 3.3 miles of occupied leks or in identified sage-grouse winter habitat. Another would prohibit more than 1 percent new surface disturbance per square mile. These measures were supported by the testimony of Dr. Braun and by the findings in the NTT Report.

To determine whether irreparable harm would occur if these measures were not adopted, the Court must evaluate the BLM's plans for the interim period. The BLM has its own set of interim measures adopted from Wyoming's Core Area Strategy (CAS). To draft its CAS, Wyoming put together a team including the BLM, the FWS, the Wyoming

Department of Game and Fish, and representatives from drillers, ranchers, and conservation organizations. The team's purpose was to avoid a listing for the sage grouse under the Endangered Species Act (ESA). The CAS identifies priority habitat areas (referred to as "Core Areas") that include breeding, brood rearing and other seasonal sage grouse habitats. Given that one of the main threats to sage grouse is the loss or fragmentation of their habitat, the CAS protects Core Areas by restricting or prohibiting activities that destroy or fragment habitat. In July of 2010, the Wyoming legislature adopted a joint resolution endorsing the CAS.

Shortly thereafter, the BLM adopted Wyoming's CAS and will apply it until the new Pinedale RMP is completed in 2014. *See Transcript (Vol. II)* at p. 507. The CAS measures are less protective of the sage grouse than WWP's proposals. For example, they would allow up to 5% new surface disturbance per square mile while WWP seeks no more than 1%. They would also allow drilling in Core Areas outside of the spring season within six-tenths of a mile while WWP's buffer zone would be 3.3 miles. But the BLM buffer zone is enlarged during the critical spring season. At that time – March 15 to June 30 – the BLM buffer zone would prohibit drilling altogether in Core Areas to protect nesting and early brood-rearing habitats. *See BLM Instruction Memorandum (Dkt. No. 167-1)* at p. 5. Outside of the Core Areas, during this spring season, there must be a buffer zone of 2 miles around leks. *Id.*

Comparing the location of Core Areas with drilling sites, it appears at first glance that the Core Areas were selected to avoid any interference with drilling. This was true in

some instances.  For example, sites already under intensive drilling – the Jonah Field and

the Pinedale Anticline – were excluded from Core Areas.  Tom Christensen, the Sage

Grouse Coordinator at the Wyoming Department of Game and Fish and a participant in

the formation of the CAS, was asked why one area was not included in a larger Core

Area, and he responded, "Because of the development already in the area . . . ."

*Transcript (Vol. III)* at p. 600.  Christensen conceded that the Core Areas in the northeast

part of Wyoming, not including Pinedale, "came after much of the development had

occurred [and so] the proportion of birds protected in there is not the same as in the rest of

the state." *Transcript (Vol. III)* at p. 595.  But in the Pinedale area, Core Areas "are much

more based on the biology of the bird.  Many of the spaces in between the Core Areas are

actually defined by natural barriers and areas of non-habitat." *Id.*

Christensen went on to describe how the CAS team identified Core Areas by

taking into account (1) winter and summer habitats, (2) connectivity between

subpopulations, (3) the most recent data on lek locations, and (4) the need for 4 mile

buffer zones around leks. *See Transcript (Vol. 3)* at pp. 597-99.  Thus, while existing

drilling sites affected the selection of Core Areas, on-the-ground data about sage grouse

leks played a key role.  In the end, about 83% of Wyoming's sage grouse population is

protected by the CAS. *Id.* at p. 585.  Thus, it appears that Wyoming has made an effort to

protect the birds in their natural habitats and not just on land ignored by drillers.  The

FWS, a participant in the CAS's formation, concluded that if the CAS was fully

implemented in Core Areas, it "would provide adequate protection for sage-grouse and

their habitat in that State." *See* 75 Fed.Reg. 13975.

Dr. Braun did testify that irreparable damage to the sage grouse could occur in the next two years if two proposed drilling projects – the LaBarge and Lance Projects – became operational, and if a major stochastic event occurs, like a wildfire. *See Transcript (Vol. 1)* at pp. 139-41. Given the general rush to drill in this area, it is certainly likely that the two projects will eventually be approved in some form. Yet both projects are far from operational. Testimony at the evidentiary hearing established that neither has been approved by the BLM, and both are undergoing NEPA review. Both projects must be subjected to public review, and then the BLM must take a "hard look" at the environmental impacts in an EIS before either project goes on line. The Supreme Court has held that it is improper to enjoin proposed agency action that will be subject to a NEPA review that could be challenged in court at that time. *Monsanto Co. v. Geertson Seed Farms*, 130 S.Ct. 2743, 2760 (2010). Moreover, while it is impossible to predict an approval date, it would most likely be at the far end of the two-year period if it comes within that period at all. Even this is highly speculative, however, and injunctive relief cannot be based on speculative consequences. *Stormans, Inc., v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009).

The issue is not whether the LaBarge and Lance Projects are good for sage grouse. That issue is not before the Court. The issue is whether the Projects will become operational in the 2-year interim period and have an impact in that period. Because that is speculative, and because WWP retains the right to challenge the Projects at that time, the

proposed Projects carry little weight in the analysis.

In summary, the CAS imposes new protections for the birds from drilling.  There are, however, far fewer new protections in the CAS from the impacts of livestock grazing. The term "surface disturbance" in the CAS excludes livestock grazing impacts.  And Buddy Green, the BLM's Deputy State Director in Wyoming, testified that unless there is a drought, existing grazing practices are not addressed in the CAS.  *See Transcript (Vol. II)* at pp. 508-10.  During a declared drought, the CAS would allow the BLM to adjust season of use and stocking rates.  *Id*. at p. 509.  But there is no declared drought currently in Pinedale and no efforts underway to adjust seasons of use or stocking rates based upon a drought declaration.  *Id*. at pp. 509-10.

Adhering to the status quo does little for the sage grouse.  There has never been a grazing EIS for the Pinedale allotments.  The most recent allotment management plan was completed more than 40 years ago.  *See Exhibit 1128; Transcript (Vol. II)* at pp. 523-26. The Court's earlier decision noted that about a third of the allotment acres in Pinedale did not meet the rangeland health standards.  *WWP v Salazar*, 2011 WL 4526746 (D.Id. September 28, 2011) at *6.  Dr. Braun testified as to the adverse impacts of spring grazing, and the BLM's own analysis concluded that "much of the rangeland throughout the Pinedale Field Office is continuously spring grazed."  *See Transcript (Vol. II)* at p. 492.

At the same time, however, the allotment acres that fail to meet rangeland standards generally fall outside the Core Areas of sage grouse habitat.  *See Exhibit 2016.*

**Memorandum Decision & Order – page 13**

Of those Core Area acres, about 82% are within allotments that have been assessed for rangeland health. *Id.* And of those assessed acres, about 76% met rangeland standards. *Id.* Allotments that did not meet rangeland health standards attributed to livestock grazing made up 24% of the Core Area that was assessed. *Id.*

With regard to winter habitat, 86% of sage grouse winter concentration area is within grazing allotments that have been assessed for rangeland health. *Id.* Allotments that met rangeland health standards made up 83% of winter concentration area that was assessed. *Id.* Allotments that did not meet rangeland health standards attributed to livestock grazing made up 17% of the winter concentration area that was assessed. *Id.*

At the evidentiary hearing, WWP showed that two allotments – the North and South LaBarge allotments – failed to meet rangeland health standards yet the BLM had made no changes to their allotment management plans. The BLM countered with evidence that it had worked with permit holders to decrease the forage consumed by livestock on both allotments. While the BLM's 2010 monitoring showed moderate to heavy utilization of forage (on western pastures) on both allotments, the 2011 monitoring showed predominately light to moderate utilization (on the same pastures). *See Transcript (Vol. II)* at pp. 459-64. This shows that the BLM's efforts got some results, but the fact remains that the BLM has done no evaluation of the allotments to determine if the decreased utilization has resulted in overall better habitat or has cured the rangeland health violations.

Reviewing the BLM's efforts in Pinedale, the Court finds real efforts to mitigate

the effects of drilling.  The CAS is a serious and coordinated effort by stake holders in Wyoming to counter the effects of drilling.  It has been in place now only about 4 years, *see Transcript (Vol. III)* at p. 608, and so its full effects remain to be felt on the ground, but it is a clear break from the past.

The Court cannot find the same effort devoted to mitigating the impacts of livestock grazing.  Nevertheless, as discussed above, the Court is not sitting to determine what is best for the sage grouse; instead, the Court must determine whether during the next 2 years the sage grouse will suffer irreparable harm if WWP's interim measures are not imposed.

This distinction is important.  For example, Dr. Braun testified in support of WWP's proposed interim measures that would stop spring and twice-over grazing and leave 70% of herbaceous production each year to form cover for the next year.  There is no dispute that these measures would provide substantial benefit to sage grouse.  But given the legal standard defining this Court's role, the Court must determine what effect these measures would have in the next two years.  And on that point, Dr. Braun testified that even if WWP's grazing restrictions were imposed, he did not "expect much in two or three years in terms of vegetation composition" in Pinedale.  *See Transcript (Vol. I)* at p. 210.  The issue thus becomes whether the BLM's grazing management over the next two years would be so much worse that it would cause irreparable harm to the sage grouse.

Despite its past hands-off management style, the BLM is now taking a more activist role.   Buddy Green, the Deputy State Director for the BLM in Wyoming, testified

that the BLM was monitoring two allotments that failed to meet rangeland health

standards and explained the BLM's efforts to work with permit holders to improve

conditions there.  Much of the prime habitat for the sage grouse in Pinedale lies in Core

Areas that are marked for increased protection.  And much of that prime habitat, as

discussed above, lies in areas that are meeting rangeland health standards.  Thomas

Christensen, the Sage Grouse Coordinator for Wyoming's Department of Game and Fish,

who has studied Wyoming's sage grouse since 1987, testified that since 1995, when the

sage grouse numbers in Pinedale were at their all-time low, "there has been a general

increase."  *See Transcript (Vol. III)* at p. 591.  He also testified that there are "good

numbers of leks in the Pinedale area [and] . . . the density is high there," and that over the

next two to three years "there is not going to be a significant change to the sage grouse

population in the Pinedale area."  *Id*. at p. 614.

　　　　For all of these reasons, the Court cannot find that WWP's interim measures are

necessary to prevent irreparable harm in Pinedale during the next five years.  The Court

will accordingly deny WWP's request for injunctive relief in the Pinedale Field Office.[1]

---

[1] WWP's original motion asks the Court to order the BLM to use the Habitat Assessment Framework (HAF) in Pinedale.  *See Motion for Remedies (Dkt. No. 151)* at p. 2.  Buddy Green, Pinedale's grazing manager, testified that the HAF is being used at the allotment level but not at the planning level due to the large size – 1.6 million acres – of the Field Office.  *See Transcript (Vol. II)* at p. 449.  The BLM will use the Seasonal Habitat Model developed by the U.S Geological Survey, *id*. at 497, and use data provided by the Wyoming Department of Game and Fish.  *See Keefe Declaration (Dkt. No. 167-10)* at ¶ 11.  Green testified that this will be sufficient for planning purposes, and the Court cannot find otherwise on this record.  *Id*. at p. 507.

**Memorandum Decision & Order – page 16**

**Craters of the Moon**

As discussed above, the revised Craters RMP and associated allotment management plans based on that RMP should be completed within the next 5 years. Thus, the issue here is whether, during this 5-year interim period, sage grouse in Craters would suffer irreparable harm if WWP's interim protections are not adopted.

In its post-hearing briefing, WWP observed that "the BLM's management of grazing in the Craters of the Moon has apparently started to reflect these recommendations [made by Dr. Braun]. *See WWP Post-Hearing Brief (Dkt. No. 224)* at p. 25. Indeed, the BLM is following recommendations made in a Nature Conservancy study (by Jurs and Sands) that Dr. Braun relied upon. *See Dr. Braun Declaration (Dkt. No. 151-2)* at ¶ 39. David Patten, the BLM's Rangeland Management Specialist responsible for grazing management on Craters, testified that he was following the study's recommendations to encourage non-use, adopt a rest rotation system, and reduce cattle movement across the allotment. *See Transcript (Vol. I).* at p. 280-282.

These management measures have had effects on the ground. During the years 2008 to 2011, average utilization levels on Craters' allotments as a whole were well-within the recommendations of Dr. Braun and other experts, while stubble heights were not far from recommended levels. *See Exhibit 2023* (showing utilization levels below 25% each year, and stubble heights of 17.7, 17.5, 15.6, and 13.3 cm)*; Dr. Braun Declaration (Dkt. No. 151-2)* at ¶ 33 (recommending utilization rates of 25% to 30%); *Connelly Guidelines Exhibit 1008* (recommending stubble heights of at least 18 cm). In

the most critical allotment – Laidlaw Park – actual use is about 20% of permitted use due to the BLM's efforts to get permit holders to reduce their grazing to improve sage grouse habitat. Six of the seven pastures in the allotment are on a rest-rotation grazing system so that two pastures are rested every year. *See Transcript (Vol. II)* at p. 255.

The effect of this grazing management was observed by Thomas Rinkes, the Idaho Wildlife Lead for the BLM, who has studied sage grouse for decades. He was a member of the NTT, a co-author of the Habitat Assessment Framework that WWP proposes be used in this case, and a co-author with Dr. Braun of sage grouse studies. After conducting a three-day field tour of Craters, he concluded that the rest-rotation system led to a "positive response of herbaceous vegetation." *Id*. at 407. He observed on his tour that plant growth provided sufficient cover to protect sage grouse in their nesting and brood-rearing habitat so that no irreparable harm would come from not adopting WWP's interim measures. *Id*. at 373-74.

While Rinkes found poor areas in his tour, he did not believe removing livestock from those areas for the next 10 years would return them to good condition because "many of these habitats are really almost a semidesert. They receive very little precipitation, and the response of the vegetation takes many years." *Id*. at p. 367. He testified that other areas have good cover and forage for sage grouse, and that WWP's proposed interim measures would impose a "one-size-fits-all approach" that is "probably not appropriate" for Craters. *Id*. at p. 375. In his opinion, there would be no irreparable harm if WWP's interim measures were not adopted.

**Memorandum Decision & Order – page 18**

Importantly, he testified that his opinion as to the good condition of Laidlaw Park would have to change if livestock use became heavier. *Id*. at pp. 409-10. However, the grazing manager, David Patten, testified that in the next few years, the BLM does not anticipate changing any of its efforts to reduce use or improve conditions in Laidlaw Park. *See Transcript (Vol. II)* at pp. 281-82.

WWP asks the Court to impose a requirement on all allotments in Craters that would "enjoin BLM from allowing grazing increases above current levels . . . ." *See WWP Post-Hearing Brief (Dkt. No. 224)* at p. 26. Patten's testimony, however, indicates that the BLM is not going to be increasing grazing levels and is actually working to reduce levels. Under these circumstances, the Court refuses to issue a blanket restriction on all allotments when the testimony has shown that conditions vary considerably and the Court lacks specific evidence of allotment-by-allotment conditions.

For all of these reasons, the Court cannot find that WWP's interim measures are necessary to prevent irreparable harm in Craters during the next five years. The Court will accordingly deny WWP's request for injunctive relief in the Craters of the Moon Field Office.[2]

## Conclusion

In this decision, the Court is not determining what is best for the sage grouse. The

---

[2] WWP's original motion asks the Court to order the BLM to use the Habitat Assessment Framework (HAF) in Craters. *See Motion for Remedies (Dkt. No. 151)* at p. 2. The evidence shows that the HAF is being used in Craters and so there is no reason to order that it be used. *See Wright Declaration (Dkt. No. 167-11)* at ¶ 6 (statement by Gary Wright, BLM Wildlife Biologist, that "[t]he BLM . . . now uses the [HAF] methodology . . . ").

Court is also not approving any particular program such as the Core Area Strategy. The allotment-by-allotment management of grazing and drilling in the two Field Offices is not the subject of the Court's review in this decision. Instead, the Court's review is limited to determining if irreparable harm will occur to the sage grouse if WWP's proposed management measures are not implemented during the time the RMPs are being revised.

After analyzing the issues under that narrow scope of review, the Court finds that WWP's motion should be granted in part and denied in part. The Court will grant the motion to the extent it seeks (1) to remand all issues concerning the Craters of the Moon RMP and the Pinedale RMP to the BLM, without vacatur, for the purpose of revising both RMPs; and (2) to order the BLM to complete the new Craters RMP by the end of 2014, and complete the Pinedale RMP by the end of 2016. While the Court will not order the BLM to comply with the procedures set forth in the Ralston and Green Declarations cited above, it is relying on those procedures being carried out in making the rulings in this decision. WWP's motion will be denied to the extent it seeks to impose interim measures to manage grazing and drilling during the time the RMPs are being revised.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that WWP's motion for remedies on test case RMPs (docket no. 151) is GRANTED IN PART AND DENIED IN PART. It is granted to the extent it seeks (1) to remand all issues concerning the Craters of the Moon RMP and the Pinedale RMP to the BLM, without vacatur, for the purpose of

revising both RMPs; and (2) to order the BLM to complete the new Craters RMP by the end of 2014, and complete the Pinedale RMP by the end of 2016.  It is denied in all other respects.



DATED:  **November 20, 2012**

Honorable B. Lynn Winmill
Chief U. S. District Judge